## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**CHARLES MAPLES**                                    **CIVIL ACTION**

**VERSUS**                                               **NO.  13-2535**

**ROBERT TANNER, WARDEN**                        **SECTION "E"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.[1]

I.      **Procedural history**

Petitioner, Charles Maples, is a state prisoner incarcerated in the Rayburn Correctional

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.  28 U.S.C. § 2254(e)(2)(B).

Center, in Angie, Louisiana.  On September 1, 2004, Maples was charged by bill of information

with attempted second degree murder in violation of La. R.S. 14:30.1, 14:27.[2]  He pleaded not

guilty.[3] On February 6, 2007, after a two-day jury trial, he was found guilty of attempted second

degree murder.  Maples was sentenced on February 23, 2007 to forty years imprisonment at

hard labor without benefit of probation, parole or suspension of sentence.[4]  He filed a motion

for reconsideration of sentence, which was denied.[5]

On direct appeal, Maples raised two assignments of error:  (1) the trial court failed to

properly instruct the jury on the definition of the offense throughout the entire course of voir

dire; and (2) the sentence was excessive.  The Louisiana Fourth Circuit Court of Appeal

affirmed his conviction and sentence on May 7, 2008.[6]  The Louisiana Supreme Court denied

his subsequent writ application without stated reasons on February 6, 2009.[7]  Maples did not

---

[2] State Rec., Vol. 2 of 5, Bill of Information.

[3] *Id.*, Minute Entry 9/7/04.

[4] State Rec., Vol. 2 of 5, Transcript of sentencing proceedings held February 23, 2007, p. 3.  The copy of the transcript included in the state court record does not reflect that the sentence was imposed at hard labor, but the court minutes, docket master and Fourth Circuit's opinion on direct appeal all reflect that the sentence was imposed at hard labor. The discrepancy is not relevant for the purposes of the claims raised herein.

[5] State Rec., Vol. 1 of 5, Minute Entry of 6/15/07.

[6] *State v. Maples*, 07-0874, 2008 WL 8922696 (La. App. 4th Cir. 5/7/08); State Rec., Vol. 2 of 5.

[7] *State v. Maples*, 2008-1212 (La. 2/6/09), 999 So.2d 768; State Rec., Vol. 5 of 5.

seek review to the United States Supreme Court.

On July 7, 2009, Maples submitted a *pro se* application for post–conviction relief to the state district court.[8] In his application, he raised the following claims for relief: (1) the prosecution failed to prove beyond a reasonable doubt that petitioner committed attempted second degree murder; (2) the trial court erred in denying his motion for a mistrial based upon the prosecution's erroneous use of "great bodily harm" as an element to support attempted second degree murder; and (3) appellate counsel failed to raise on appeal the issue of the trial court's failure to grant a mistrial based on the prosecution's misstatement of law during voir dire. On June 27, 2012, the district court denied post-conviction relief without stated reasons.[9]

On October 11, 2012, Maples filed his writ application in the Louisiana Fourth Circuit Court of Appeal.  On October 19, 2012, the court of appeal denied relief without written reasons on the merits, but rather, simply finding no error in the judgment of the district

---

[8] State Rec., Vol. 1 of 5, Uniform Application for Post-Conviction Relief signed July 7, 2009.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." *Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006).  If that date cannot be gleaned from the state court record with respect to the filings in this case, this Court will simply use the signature date of the applications as the filing date, in that the various applications were obviously placed in the mail no earlier than the date they were signed. In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court.

[9] State Rec., Vol. 1 of 5, Minute Entry of June 27, 2012.  The trial court's ruling followed the Louisiana Fourth Circuit's grant of petitioner's request for mandamus and a ruling on his post-conviction relief application.  *State v. Maples*, 2012-0649 (La. App. 4th Cir. 5/9/12).

court.[10]  On November 30, 2012, Maples filed a request for supervisory writ of review in the Louisiana Supreme Court.[11]  On April 19, 2013, the Louisiana Supreme Court denied relief without stated reasons.[12]

On April 30, 2013, Maples filed his federal application for *habeas corpus* relief.[13] In his petition, Maples raises the following claims:  (1)the prosecution failed to prove beyond a reasonable doubt that petitioner committed attempted second degree murder; (2) the trial court erred in denying his motion for a mistrial based upon the prosecution's erroneous use of "great bodily harm" as an element to support attempted second degree murder; and (3) appellate counsel failed to raise on appeal the issue of the trial court's failure to grant a mistrial based on the prosecution's misstatement of law during voir dire.

The State filed a response conceding that the federal application is timely and that petitioner has exhausted his remedies in the state courts.[14]

---

[10] *State v. Maples*, 12-1476 (La. App. 4th Cir. 10/19/12); State Rec., Vol. 4 of 5.

[11] State Rec., Vol. 5 of 5.

[12] *State ex rel. Maples v. State*, 2012-2598 (La. 4/19/13), 111 So.3d 1036; State Rec., Vol. 5 of 5.

[13]  Rec. Doc. No. 3, Petition. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  *Roberts v. Cockrell*, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner signed the petition on April 30, 2013, which is presumed to be the earliest date on which it could have been delivered to prison authorities for mailing.

[14] Rec. Doc. No. 10, pp. 8, 12.

4

**II.    Facts**

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts as

follows:

NOPD Officer Giselle Bertrand, a 911 operator, testified that on May 31, 2004, she received an emergency call concerning a shooting at First and South Prieur Streets.

Officer Lawrence Dupree testified that he was at the Medical Center of Louisiana investigating an unrelated matter when the victim arrived at the hospital in a vehicle driven by Martin Philip. The victim was conscious and was attempting to soothe his five-year old son, Robert Kendrick, III (Ronald), who witnessed the shooting. Dupree inspected the vehicle and noted a bullet hole in the front driver's door. From conversations with Terrell Alonso, a friend, and Tierra Kendrick, the victim's wife, Dupree learned that someone called "Seabury" was the shooter. Three days after the shooting, Dupree interviewed the victim who told Dupree that on May 31, 2004, the victim, along with his five-year old son, Ronald, and Terrell Alonso were talking in the 3300 block of Washington Avenue when "Seabury" walked up and shot him. Sometime in June 2004, Dupree presented the victim with a photo line-up from which the victim identified the defendant as his assailant. Dupree obtained an arrest warrant for the defendant. The following day, the defendant turned himself into police.

NOPD Officer Kristie Harper was the first officer to arrive at the shooting scene. The officer cordoned off the site and began to look for evidence. The lighting in the area was poor. Officer Harper did not find the victim at the scene but she found a pool of blood, a cigar, miscellaneous coins and the victim's Louisiana driver's license. The officer identified crime scene photos and pointed out the evidence as it appeared in the photos.

Surgeon, Dr. Sharon Weintraub, undertook the victim's care when he arrived at the hospital. The doctor noted that the victim suffered three gunshot wounds—one to the abdomen and two in his back, which required several surgeries to assess and repair the damage. One of the gunshot wounds to the victim's back rendered him a paraplegic confining him to a wheelchair for the rest of his life.

The victim testified that on the evening of May 31, 2004, he was driving his friend, Earnest Alexander, to a bus stop when the defendant pulled his vehicle in front of the victim's car forcing the victim to stop. When the victim got out of his car, the defendant accused the victim of having something to say to him. The defendant approached the victim, and an argument ensued. When the victim turned to walk back to his car, the defendant shot the victim twice in the back. The victim turned toward the defendant. The defendant shot the victim a third time in the abdomen. The victim's friend, Phillip Martin, placed the victim in the victim's car and drove him to the hospital. About two weeks after the incident, the victim was able to speak with Officer Dupree to relate the facts of the shooting and identify his assailant.

The defendant testified that on the evening of May 31, 2004, he and Terrell Alonzo were at Alonzo's house on Washington Avenue when the victim walked up to the pair and accused the victim of saying things about him and then warning the defendant to be careful what he said. The defendant left the vicinity about twenty minutes later heading for his home in the Calliope development. When the defendant arrived at the intersection of First and Prieur Streets, the victim flagged him down. The victim told the defendant that they were going to finish their earlier conversation. The victim exited his car leaving the driver's door open, and approached the defendant's vehicle. The victim warned the defendant not to bring a gun. The victim then told the defendant "I'm going to put something on your ass." When the victim "broke" toward his car, the defendant thought the victim was going to get something to hurt the defendant. The defendant admitted firing four shots at the victim but claimed he did so in self defense. The defendant denied trying to hurt the victim.[15]

## III.    Standards of review on the merits

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure

---

[15] *State v. Maples*, 07-0874 , 2008 WL 8922696, at *1-2 (La. App. 4th Cir. 5/7/08); State Rec., Vol. 2 of 5.

questions of law, and mixed questions of both. The amendments "modified a federal *habeas* court's role in reviewing state prisoner applications in order to prevent federal *habeas* 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell*, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

*Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), *cert. denied*, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:

> [A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal but applies that rule unreasonably to the facts of a particular prisoner's case.

*White v. Woodall*, 134 S.Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

*Id.* (citations and quotations marks omitted). The Supreme Court has also warned that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir.2011) ("Importantly, 'unreasonable'

8

is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.  If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Harrington v. Richter*, 131 S.Ct. 770, 786–87 (2011) (citations omitted; emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010) ("AEDPA prevents defendants—and federal courts—from using federal *habeas corpus* review as a vehicle to second-guess the reasonable decisions of state courts.").

 Section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits," for purposes of applying the AEDPA deferential standard of review. *Richter*, 131 S.Ct. at 784–85. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the

state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 784.

## IV.    Petitioner's Claims

### A.    Sufficiency of the evidence

Petitioner claims that the evidence was insufficient to support his conviction for attempted second degree murder because the State failed to prove beyond a reasonable doubt that petitioner possessed the requisite specific intent to kill.  Petitioner raised this claim on post-conviction review.  The state district court denied the claim without explanation "after careful review and consideration."  Upon review, the Louisiana Fourth Circuit stated it "finds no error in the judgment of the district court denying relator's application for post-conviction relief."  The Louisiana Supreme Court likewise denied relief without reasons.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a federal *habeas* court addressing an insufficiency of the evidence claim must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir.2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir.2008). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. *Perez*, 529 F.3d at 594 (*citing Jackson*, 443 U.S. at 324 n. 16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v.*

*Brown*, 558 U.S. 120, 131, 130 S.Ct. 665, 672 (2010) (recognizing that a reviewing court must consider the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir.2009) (*Jackson* standard relies "upon the record evidence adduced at the trial") (*quoting Jackson*, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. App'x. 442, 443 (5th Cir.2004) (*citing United States v. Garcia*, 995 F.2d 556, 561 (5th Cir.1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir.2005).

A federal *habeas* court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir.1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir.1985).   In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.' "*Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir.2001) (*quoting Herrera v. Collins*, 506 U .S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact. *Perez*, 529

11

F.3d at 594; *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir.1995). Therefore, this Court must examine whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Under Louisiana Revised Statute 14:27(A), a person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object."  Second degree murder is, in pertinent part, defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1). While murder requires the specific intent to kill *or* to inflict great bodily harm, attempted murder requires the specific intent to kill. *State v. Andrews*, 95-129 (La. App. 5th Cir. 1995), 665 So.2d 454, 456. Thus, the elements of attempted second degree murder are the specific intent to kill a human being and an overt act in furtherance of the object. *State v. Butler*, 322 So.2d 189, 192 (La.1975).

In *State v. Broaden*, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (internal quotation and citations omitted), the Louisiana Supreme Court succinctly summarized the specific intent analysis:

> Specific criminal intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill.

12

Specific intent may be proved by direct evidence, such as statements by the defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. *State v. Powell*, 94–1390 (La. App. 1st Cir. 10/6/95), 671 So.2d 493, 498.

In a non-homicide situation, a claim of self-defense requires a dual inquiry: first, an objective inquiry into whether the force used was reasonable under the circumstances, and, second, a subjective inquiry into whether the force used was apparently necessary. *See* La. R.S. 14:19(A); *State v. Taylor*, 97–2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 931. Self-defense is not available to "[a] person who is the aggressor or who brings on a difficulty ... unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21.

The victim and petitioner testified to conflicting versions of the events that occurred before the shooting.  The victim denied having a gun or threatening Maples.  However, Maples claimed he shot the victim in self-defense.

The victim, Ronald Kendrick, Jr., testified that he first encountered Maples at a mutual friend's house around 7:30 p.m. on the night of the incident.  Kendrick drove to her house with his five-year old son, and a friend, Ernest Alexander.   Kendrick did not go inside the house. As he stood outside, Maples, known to the victim by the name "Seabury," and Terrell Alonso started roughhousing with Alexander, throwing him against a neighbor's garage door.  The neighbor came outside and told Kendrick to stop.  Kendrick told him he was talking to the wrong man and pointed in the direction of Maples and the others.  Maples started "talking all

13

crazy and stuff" and he and Kendrick began to argue.  Kendrick's friend who owned the home asked everyone to leave; Kendrick, his son and Alexander got in the car and left.  As he was driving to a nearby bus stop to drop off Alexander, Maples pulled his vehicle in front of Kendrick's car and forced him to stop.  When Kendrick got out of his car, Maples accused him of having something to say to him, and they began to argue.  Kendrick turned away from Maples and as he was walking back to his car, Maples shot him twice in the back.  Kendrick testified that the following exchange occurred at this point:

> A. After I heard the shots, I turned around, like, shocked, like, "Man."  And I'm talking, like, "What  you're shooting for?"  I'm like, "What you got a gun for, man?"  I mean, we done argued, you know, "We done argued before. Why you shooting?"  You know, and he's like, he just at this point, just looking like, you know, like –
> Q.  Did he say anything?
> A. He didn't say anything.  He just was, like, you know, he was just – I guess he was stunned that he did it hisself that he was just looking. I mean, you know, we just looked.  And I'm constantly talking, like, "Man, what's up?" And at that time, he let off a few more rounds.  And that's when one struck me in the stomach area, the abdomen area.  At that time, when he shot a few more times, I fell back.... []
> Q. Now – I'm sorry – Was anything said before the shots went off?
> A. There was something said, was something he told me, "I got you now.  I got you now."
> Q. When did he say that?
> A. When I turned around and walked away from him.
> Q. He said, "I got you now?"
> A. Said, "I got you now."[16]

Kendrick also testified that he turned away from Maples to walk back to his car because he

---

[16]  State Rec., Vol. 2 of 5 - Transcript of February 6, 2007, pp. 23-24.

didn't feel like arguing with him, and he had his son in the car.  Kendrick testified that he did

not have a gun in his possession.[17]  The surgeon's testimony confirmed that he suffered three

gunshot wounds, one to the abdomen and two in his back.[18]

Maples also testified at trial and his version of the shooting differed from the victim's.

Petitioner testified that approximately 20 minutes after his first encounter with the victim, he

drove home.  As he was driving home, petitioner saw Kendrick's car parked on the side of the

road.  Kendrick was flagging petitioner down and he told petitioner they were going to

continue their earlier conversation.  Kendrick told him not to bring a gun.  Maples testified to

his version of events that occurred before the shooting:

> A.  Head was standing on the passenger side of the car right by the front fender.
> The little boy was in the middle, and Damien was right next to the little boy, a
> few feet from him.  And they was all standing and watching us as we had started
> talking about what was supposed to be said.  The next thing you know, he told
> me he was going to fuck me up.  Then he comes back.  Excuse my language.  I'm
> sorry.  I'm sorry about that, but that's how that happened.  Then he hollered,
> "Wait." You wait right here.  I'm going to put something on your ass." And right
> then and there, he broke towards his car.  His car door also was open, by the
> way.  I thinking he's going to get something to hurt me, so I acted off of that.  But
> my intention was not to hurt him, just to stop him from getting to his car.
> Q. How many shots do you remember being fired?
> A. I fired four shots.
> Q. And the first shot, did you see what it struck?
> A. No, sir.
> Q. Did the first have anything to do with the automobile?
> A. I have no  idea. I was just trying to keep the man from getting to whatever he

---

[17] *Id*. at 35.

[18] State Rec. Vol. 2 of 5, Trial Transcript of February 5, 2007, p. 82.

had in his car to keep from hurting me because he already told me he was going to hurt me.[19]

Petitioner contends the State's erroneous assumption initially that "great bodily harm" was an element of attempted second degree murder impaired the State's case and resulted in insufficient evidence of specific intent to kill.   Essentially, petitioner argues that the State's case was more directed toward the "great bodily harm" the victim sustained, rather than whether petitioner possessed the "specific intent to kill."  The record simply does not support petitioner's assertion.

The evidence was sufficient to establish that petitioner had a specific intent to kill the victim in this case.  The jury obviously believed the victim's testimony that Maples was angry, pursued the victim and forced the confrontation by blocking the victim's car.  The victim turned away from Maples because he did not want to fight.  Maples said, "I got you now" and shot him multiple times in the back.  The victim then turned back to Maples, who fired again. Maples admitted at trial that he fired four shots at the victim.  The victim was struck three times, twice in the back and once in the abdomen, which coincided with the victim's version of the events.   Based on the number of times petitioner fired at the victim and the circumstances surrounding the shooting, the jury reasonably could have inferred petitioner had the specific intent to kill him.  Although the petitioner testified he believed the victim was going to get a gun and that his own life was in danger, the guilty verdict in this case indicates

---

[19] *Id.* at 95-96, 104.

the jury rejected his claim that he shot the victim in self-defense.  When reviewing a sufficiency of the evidence claim, a federal *habeas* court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson*, 443 U.S. at 319.

The evidence in this case was more than sufficient for a reasonable jury to conclude that Maples acted with specific intent to kill and to support the verdict of attempted second degree murder.  Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Maples is not entitled to relief on this claim.

**B.    Denial of motion for mistrial**

Maples contends the trial court erred in denying his motion for a mistrial based on the prosecution's reference to the element "great bodily harm" during voir dire and opening statements, and that the failure to declare a mistrial denied him due process and a fair trial.[20] Petitioner first raised this argument on direct appeal, albeit in a different context that did not

---

[20] To the extent petitioner merely claims that the trial court's denial of a mistrial constituted error or an abuse of discretion under state law (La. C.Cr.P. arts. 770, 771), this is a question of state law and not a federal constitutional claim, which is not a cognizable claim for federal *habeas* review. 28 U.S .C. § 2254(a); *see also Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

involve the mistrial motion. He argued the trial court failed to instruct the jury properly during voir dire after the prosecutor made an erroneous statement of law. The court of appeal concluded Maples suffered no prejudice because the State subsequently corrected its erroneous definition and the trial court gave a curative instruction and proper jury instruction before deliberations. On post-conviction review in the state courts, petitioner presented the claim raised in this Court that the trial court erred in denying his motion for a mistrial based on the State's mistaken articulation of the elements of the offense. The state courts denied relief on the merits without stated reasons.

A trial court's denial of a motion for a mistrial triggers federal *habeas corpus* relief only if it was "error ... so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause." *Hernandez v. Dretke*, 125 F. App'x 528, 529 (5th Cir.2005) (*quoting Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir.1988)). To obtain relief, the petitioner must show that the state trial court's error, if any, had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The petitioner must show that "there is more than a mere reasonable possibility that [the error] contributed to the verdict. It must have had a substantial effect or influence in determining the verdict." *Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir.1996) (emphasis omitted). In order to satisfy due process, Maples's trial must have been fair; it need not have been perfect. *See United States v. Hasting*, 461 U.S. 499, 508, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

Maples argues the prosecutor's error had an extreme impact on the jury that denied

18

him a fair trial.  He insists that although the trial court correctly charged the jury and gave explicit curative instructions, this could not remedy the prejudicial error and that a mistrial was the only constitutionally adequate remedy.  A review of the record reveals, however, that the state's error did not render Maples's trial fundamentally unfair.

The misstatement of law was made by the State during voir dire and opening statements.[21]  In discussing the elements of the crime of attempted second degree murder, the prosecutor represented that the offense included *either* specific intent to kill the victim *or* the infliction of great bodily harm on the victim.[22]  Later in voir dire, defense counsel represented that the definition did not include the element of causing great bodily harm.[23]  Discussions took place outside of the hearing of prospective jurors, but it appears the matter was not resolved and no correction or clarification was made during voir dire.[24]  The issue was ultimately

---

[21] The state court record does not contain a transcription of opening statements.  The record contains only a court reporter's note of one objection by defense counsel, which did not pertain to this issue. State Rec., Vol. 2 of 5, Trial Transcript of February 5, 2007, p. 15. However, the Court notes petitioner's argument in brief that during opening arguments the prosecution, over trial counsel's objection, continued to list "great bodily harm" as an element. See p. 7, Petitioner's Application for Supervisory Review to the Fourth Circuit, attached to and referenced in his federal application at Rec. Doc. 3, p. iv.

[22] State Rec., Vol. 3 of 5, Transcript of Voir Dire, pp. 26-28.

[23] *Id.* at 56-59, 128-129.

[24] State Rec., Vol. 2 of 5, Trial Transcript of February 5, 2007, pp. 3-12 (court reporter's note regarding objections made during voir dire examination).

resolved on the second morning of trial.[25]

Before trial began the second day, counsel for the parties held a discussion in chambers and agreed that proof of attempted second degree murder required specific intent to kill, and did not include as an element the intent to cause great bodily injury.  Defense counsel moved for a mistrial and the motion was denied.[26]   Defense counsel then asked the trial court to admonish the jury "to disregard anything and everything the doctor said and all the questions asked by the prosecution during the voir dire with reference to inflicting great bodily harm." The State argued admonishment would be improper because the doctor's testimony "could just have easily gone to the defense case that this is a crime of a lesser grade."  The trial court agreed on a curative instruction and ruled "the instruction will include the definition of second-degree murder being the killing of a human being when the offender has specific intent to kill, period. End of story, and any and all reliance on or discussion regarding to inflict great bodily harm regarding the charge of attempt second-degree murder has to be ignored and eliminated."[27]

---

[25] Prior to this, on the first day of trial, Dr. Sharon Weintraub testified.  Defense counsel objected that her testimony regarding the extent of the victim's injuries was not relevant to the charged offense of attempted second degree murder because causing great bodily harm was not an element of that crime.  *Id.* at 74-75, 79.  The objection was overruled.  Defense counsel also moved for a mistrial based on her testimony.  The motion was denied.  *Id.* at 80, 86-87.

[26] State Rec., Vol. 2 of 5, Trial Transcript of February 6, 2007, pp. 3-9.

[27] *Id.* at 8-9.

In fact, at the end of trial, the court gave a curative instruction regarding the definition of attempted second degree murder and the specific elements jurors were to apply during their deliberation. The court stated:

> [A]t the onset, the definition of second-degree murder was given to you by the State of Louisiana. There have been some discussions, and now we want to make a correction to that. Because the defendant in this case is charged with attempted second-degree murder, in order to find the defendant guilty, the State must prove that the defendant had the specific intent to kill. There was some discussion about causing great bodily harm. That portion of the statute does not apply if you are going to come back with a verdict of guilty as charged as to attempted second-degree murder. The only portion of the second-degree murder statute that you can rely upon is a finding that there was a specific intent to kill.[28]

In addition, the trial court charged the jury as to the correct definition of attempted second degree murder (*i.e.*, defendant had the specific intent to kill the victim and he took some action designated to accomplish that).[29] During deliberation, the jurors asked the court to repeat the definition of attempted second degree murder. The trial court again defined second degree murder as the killing of a human being when the offender has a specific intent to kill, and read the attempt statutory language.[30]

The record in this case is clear that the mistake made by the State during voir dire and opening statement was corrected by the trial court by specific curative instruction and a

---

[28] *Id*. at 141-142.

[29] *Id*. at 147.

[30] *Id*. at 155-156.

proper jury instruction setting forth the elements of attempted second degree murder. Furthermore, the jury was instructed that they have the duty to accept and apply the law as given by the court and that statements and arguments of the attorneys are not evidence. Absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court. *See Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).  Given the specific instructions presumably followed by the jurors in this case, there is no basis on this record to conclude that the State's misstatement in voir dire and opening argument rendered Maples's trial "fundamentally unfair." Accordingly, Maples cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### C.    Ineffective assistance of appellate counsel

In his final claim, Maples contends his appellate counsel provided ineffective assistance on appeal by failing to raise a claim that the trial court erred in denying his motion for a mistrial.   Petitioner raised this ineffective assistance claim in state post-conviction proceedings.  The state courts denied relief on the merits without any stated reasons.

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir.2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir.2010). Thus, the question before this court is whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

22

Persons convicted of a crime are entitled to effective assistance of counsel in their first appeal of right. *See Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). To prove that appellate counsel was ineffective, a petitioner must satisfy the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 697 (1984) (*i.e.*, that counsel's performance was deficient and that the deficient performance prejudiced the defense). *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir.2004). An appellate counsel's performance may not be deemed deficient for failing to argue a frivolous or non-meritorious claim. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Furthermore, a showing of prejudice requires that a petitioner establish a reasonable probability that he would have succeeded on appeal but for his counsel's deficient representation. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir.2001); *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir.2000).

Petitioner's mistrial claim is based on his contention that he could not receive a fair trial because the prosecutor misstated in voir dire and opening argument the elements required to prove the charged offense. For the reasons previously stated, the argument lacks merit. Furthermore, appellate counsel presented substantially the same argument in a different context on direct appeal. On appeal, counsel argued that the trial court failed to instruct the jury properly when the State incorrectly instructed the jury on the elements of attempted second degree murder during voir dire proceedings. In addressing the assigned error, the Louisiana Fourth Circuit concluded:

> Given the State's dual correction of its erroneous definition of attempted second

degree murder and the trial judge properly charging the jury with the applicable law after closing arguments, the defendant did not suffer any prejudice.[31]

The state courts soundly rejected petitioner's argument. The record suggests no basis for the appellate courts to have decided the issue any differently if raised in the context of the denial of a mistrial motion. Because the claim had no merit, appellate counsel was not deficient in failing to raise it on direct appeal. Furthermore, petitioner cannot establish that the appellate court would have granted relief, had the claim been raised.

Under the doubly deferential standards mandated by the AEDPA, there is no basis for this Court to find that the state court's decision denying petitioner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, this Court should likewise deny the claim.

## RECOMMENDATION

**IT IS RECOMMENDED** that petitioner's application for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

---

[31] *State v. Maples*, 2007-0874, 2008 WL 8922696, at *3 (La. App. 4th Cir. 5/7/08).

accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (*en banc*).[32]

New Orleans, Louisiana, this 23rd day of _____ June _____ 2014.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[32] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.